IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


DODSON AVIATION, INC.,

        Plaintiff,


        vs.                    Case No. 10-4036-JTM


ORLANDO PADRON, ET. AL.,

        Defendants.



MEMORANDUM AND ORDER

The court has at hand the following motions: (1) Defendants Craig A. Davis and the Franklin County Board of Commissioner's Motion for Judgment on the Pleadings (Dkt. No. 17); (2) defendants HLMP Aviation Corporation, Javier Jorda, and Orlando Padron's Motion for Summary Judgment (Dkt. No. 33); and (3) defendants Blaine Finch, and Green, Finch, & Covington, Chartered's Motion for Summary Judgment (Dkt. No. 40). Among other things, this dispute involves whether plaintiff is entitled to damages based on defendants' actions relating to enforcement of a foreign Ex Parte Temporary Injunction in Kansas. The facts are set out below. For the following reasons, the court grants in part and denies in part the defendants' motions.


**I. Findings of Fact and Procedural Background**

Defendants Orlando Padron and Javier Jorda are residents of Florida. Padron is the president of HLMP Aviation Corporation (HLMP), a Delaware corporation jointly owned by Padron and Hernan Lopez. Plaintiff Dodson Aviation, Inc. (Dodson) is a corporation organized under the laws

of Kansas with its principal place of business in Ottawa, Kansas. Robert Dodson, Sr. (Dodson Sr.) is Dodson's president and Robert Dodson, Jr. (Dodson Jr.) is the vice president. Dodson Aviation specializes in repairing aircraft.

In 2006, Hernan Lopez contacted Dodson Sr. and Dodson Jr. to discuss repairs on a Beech King Air Model 200 aircraft (King Air), which Lopez imported from Mexico. Dodson initially quoted Lopez $250,000 for the work; but later told him the amount likely would increase. The parties had no written agreement. The understanding was that Dodson would send Lopez a bill for the cost of repairs at the end of the job. On February 9, 2007, Lopez, acting as president of PTC Aviation Corporation, sold the King Air to HLMP. However, plaintiff contends that Lopez executed the bill of sale on the King Air for purposes of holding it in escrow as security for repayment of Padron's investment pending sale of the aircraft to a third party. The parties also dispute Padron's knowledge of the cost of repairs. Plaintiff claims Padron knew of the $250,000 cost, while Padron alleges that Lopez told him $140,000 would finish the repairs.

Near the end of 2007, Padron became concerned about whether the repair work on the King Air had been completed. Padron, through his personal concierge, Javier Jorda, contacted Dodson for the first time on January 16, 2008. Until that time, Dodson had dealt exclusively with Lopez regarding the King Air repairs. Padron specifically authorized Jorda to ask Dodson about the status of the repair work and its cost. Padron also executed a Durable Power of Attorney, which gave Jorda the power to act on behalf of Padron in his capacity as President of HLMP. Jorda ordered an appraisal of the King Air. Patterson Aviation Consulting valued it at $894,000. Near the end of 2007 or in early 2008, a dispute arose between Padron and Lopez as to who would take possession of the King Air after Dodson finished the repairs.

On January 17, and again on January 28, HLMP's attorney, Manuel Mesa, wrote to Dodson Jr. and asked if there was a balance due for the repairs. On February 5, Douglas Barnard, Lopez's attorney, wrote to Dodson Jr. instructing him not to permit Padron to remove the King Air from the Dodson facility without Barnard and Mesa's approval.

On February 8, Mary Snyder, Dodson Jr.'s assistant, sent Lopez an email indicating he owed $315,957.18 on repairs, after giving $112,000 credit that had been paid previously. She also asked Lopez to let Dodson know "if any items need to be adjusted prior to showing your minority partner, etc." (February 8, 2008, email from Mary Snyder to Hernan Lopez, Dkt. No. 34, Ex. 13). Lopez responded and said he wanted to fly to Kansas and review the entire bill so they could settle on a final number that would settle the account. On February 18, Snyder sent another email, in which Dodson claimed $390,000 was due.

The next day, on February 19, Padron and Jorda met Dodson Jr. in Olathe, Kansas to discuss the status of the repairs and to determine the amount still owed. The parties dispute whether Dodson Jr. provided a specific number during the meeting.[1] But, Dodson Jr. specifically told Padron and Jorda that, due to the dispute between Lopez and Padron, Dodson would require both Lopez and Padron's consent before either could remove the King Air. A few days after the meeting, Padron gave Dodson Jr. a proposal drafted by Manuel Mesa, which contemplated that Multiphone Latin America, Inc., (a corporation controlled by Padron) would purchase the right, title, and interest in Dodson's mechanic's lien, but Dodson refused this proposal. On February 21, Padron sent Dodson Jr. an email in which he stated, "I want the toy in miami." (Dkt. No. 44, Ex. 12).

---

[1] However, Dodson did advise Padron sometime in February 2008, that it claimed an additional $390,000 for work it performed on the King Air.

Until the middle of March 2008, Dodson continued to inform both Lopez and Padron that it would release the King Air to them upon payment of $390,752.26.[2] Then, on March 14, Dodson Jr. sent an email to Mesa and Bernard stating, "[t]his is to advise you that unless we have a resolution in sight by close of business on March 19th, 2008[,] I will be exercising all available remedies including but not limited to a NON-judicial sale of the aforementioned aircraft." (March 14, 2008, email from Dodson Jr. to Manuel Mesa, Dkt. No. 34, Ex. 19). After receiving the email, Padron again insisted that Dodson accept payment for the repair bills and release the King Air to him. He also gave Dodson a March 17, deadline to respond and to advise Padron on the following:

1. If you will or will not send to us a proper invoice for the services performed on our aircraft.
2. If you will or will not send the necessary bank or payment information in order to make immediate payment for your services.
3. If you will or will not release out aircraft to us upon satisfactory payment.
4. if you will or will not release the log books, invoices, work orders and all related documentation of our aircraft.

(March 14, 2008, email from Padron to Dodson Jr., Dkt. No. 44, Ex. 13).

On March 18, 2008, Padron and HLMP filed suit against Dodson, PTC Aviation Corporation, Lopez, and 1st Source Bank in the circuit court of Miami-Dade County, Florida (Florida Suit). The same day, Padron and HLMP filed a Motion for Temporary Injunction in the Florida Suit, seeking an order requiring Dodson to "turn over the Aircraft to Padron and HLMP, permitting Padron and HLMP to relocate the Aircraft to South Florida; and enjoining all parties from selling and/or transferring the Aircraft without prior Order of this Court." (Dkt. No. 34, Ex. 8, para. 34). The Dade County Circuit Court granted the motion the same day and entered its Ex Parte Temporary Injunction, which enjoined all defendants "from selling, transferring, transporting,

---

[2]Sometime after Dodson finished the repairs, it raised the amount due to $452,000 and then to $484,000.

encumbering, auctioning, and operating" the King Air and ordered any defendant in possession of the aircraft "to transfer possession of the Aircraft to Plaintiff PADRON and/or his authorized agent upon presentation of a copy of this Order, to be relocated to a facility of PADRON's choice in Miami Dade County, Florida." (Dkt. No. 34, Ex. 21, para. 2-3). The order also required Padron and HLMP to post an injunction bond of $450,000 "to pay all costs and damages sustained by defendants if they have been wrongfully enjoined." (Dkt. 34, Ex. 21, para. 5). Padron posted this bond. Currently, the bond is set at $500,000.

On March 19, 2008, Padron and HLPM, through their counsel and co-defendant Blaine Finch, filed a Notice of Filing of Foreign Judgment in the District Court of Franklin County, Kansas under the Uniform Enforcement of Foreign Judgments Act (UEFJA). Later the same day, Craig Davis, the county sheriff, executed the Florida Temporary Injunction Order, as registered in Kansas, and removed the King Air from Dodson's possession. Davis threatened arrest to any Dodson employee that resisted execution of the injunction. Although Dodson objected to enforcement of the judgment, and filed pleadings to quash the temporary injunction in Kansas, it did not take any steps to modify or quash the temporary injunction in the Florida court.[3]

After the Franklin County District Court issued several orders,[4] the Kansas Supreme Court issued an opinion on November 25, 2009, in which it held in part: (1) as a matter of first impression, a temporary injunction from another state is not entitled to full faith and credit in Kansas and

---

[3]The injunction provided: "The Defendants and all interested parties may petition this [Florida] Court for relief from this Temporary Injunction as provided for under the Florida Rules of Civil Procedure and applicable Florida law." (Dkt. No. 34, Ex. 21, para. 4). Further, under rule 1.610 of the Florida Rules of Civil Procedure, a party against whom an ex parte temporary injunction has been issued may move to dissolve or modify the injunction.

[4]More detailed facts concerning those orders can be found in the Supreme Court's opinion in *Padron v. Lopez*, 289 Kan. 1089, 1091-96, 220 P.3d 345, 349-51 (2009).

registration of another state's temporary injunction is not permitted under the UEFJA; (2) once the Franklin County District Court decided not to enforce the Ex Parte Temporary Injunction, it lacked subject matter jurisdiction to enter any other orders, including an order requiring Padron and HLMP to return the King Air to Kansas; (3) the district court did not abuse its discretion by refusing to recognize the Ex Parte Temporary Injunction as a matter of comity; and (4) although the Florida injunction violated Kansas public policy to the extent that it altered the status quo by requiring Dodson to surrender the King Air to Padron and HLMP, it was consistent with public policy to the extent that it merely prohibited Dodson from selling the King Air. *Padron v. Lopez*, 289 Kan. 1089, 220 P.3d 345 (2009).

In addition to the Florida suit filed by Padron and HLMP, Dodson filed a lien foreclosure suit (Lien Foreclosure Suit) against HLMP Aviation Corporation, PTC Aviation Corporation, and 1st Source Bank, on July 30, 2008, in Franklin County, Kansas to foreclose the mechanic's lien on the King Air. In that case, Dodson claims defendants owe it $484,894.50 for repairs. Defendants removed the case to this court, and it is currently pending. In the Lien Foreclosure Suit, HLMP admits that Dodson has a properly perfected mechanic's lien on the King Air but denies that Dodson is entitled to the amount it claims. HLMP's expert in the Lien Foreclosure Suit, Frank Evanega, issued a report in which he concluded that Dodson substantially overcharged for the work on the King Air by billing far more hours than reasonable for the work that was done, and by trying to recover for work that was not documented. Dodson's expert, Sammy Bereznak, testified that Dodson's fee for repairs was fair and reasonable.

Plaintiff filed the current suit on March 12, 2010, in Franklin County, Kansas against defendants Orlando Padron, Javier Jorda, HLMP Aviation Corp, Blaine Finch, Green, Finch &

Covington, Chartered, Craig A. Davis, and Franklin County, Kansas Board of Commissioners. On April 16, 2010, Davis and the Franklin County, Kansas Board of Commissioners filed a Notice of Removal in this court (Dkt. No. 1). Plaintiff filed its Amended Complaint on October 7, 2010, in which it asserts four Counts against the various defendants. In Count I, plaintiff asserts an abuse of process claim against all defendants in connection with registering and enforcing the Ex Parte Temporary Injunction. Count II asserts a conversion claim against HLMP, Padron, and Jorda for divesting plaintiff of possession of the King Air. In Count III, plaintiff asserts a 42 U.S.C. § 1983 civil rights claim against Davis and Franklin County for allegedly violating Dodson's rights under the Full Faith and Credit Clause and by depriving it of its possessory lien, which constitutes a property right under the Fourteenth Amendment. Finally, plaintiff asserts a negligence claim against Davis for the manner in which he enforced the injunction. As damages, plaintiff claims it has incurred significant attorneys' fees as a result of defendants' actions in confiscating the King Air. And, Dodson's supplemental disclosures assert that its damages consist of attorneys' fees it has incurred and will continue to incur in the Lien Foreclosure Suit, attorneys' fees in this suit, and attorneys' fees in all other related legal matters.

## II. Conclusions of Law

*A. Defendants Craig A. Davis and Franklin County, Kansas Board of Commissioner's Motion for Judgment on the Pleadings (Dkt. No. 17).*

The court analyzes a motion for judgment on the pleadings under the same standard as a motion to dismiss under 12(b)(6). *Park Univ. Enters., Inc. v. Am. Casualty Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). "In reviewing a motion to dismiss, this court must look for plausibility in the

complaint . . . . Under this standard, a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Corder v. Lewis Palmer Sch. Dist No. 38*, 566 F.3d 1219, 1223-24 (10th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (clarifying and affirming *Twombly's* probability standard). Allegations that raise the specter of mere speculation are not enough. *Corder*, 566 F.3d at 1223-24. The court must assume that all allegations in the complaint are true. *Iqbal*, 129 S. Ct. at 1936-37. "The issue in resolving a motion such as this is 'not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'" *Bean v. Norman*, No. 008-2422, 2010 WL 420057, at *2 (D. Kan. Jan. 29, 2010) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). The Tenth Circuit utilizes a two-step process when analyzing a motion to dismiss. *Hall v. Witteman*, 584 F.3d 859, 863 (10th Cir. 2009). First, the court must identify conclusory allegations not entitled to the assumption of truth. *Id.* Second, the court must determine whether the remaining factual allegations plausibly suggest the plaintiff is entitled to relief. *Id.*

The court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and are undisputed. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). A court may also consider facts subject to judicial notice without converting the motion into one for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Plaintiff asserts three claims against Davis and Franklin County: (1) abuse of process; (2) 42 U.S.C. § 1983 civil rights violation; and (3) a negligence claim against Davis only. However, at the time defendants filed their Motion for Judgment on the Pleadings, plaintiff had only asserted a

§ 1983 claim against them. Plaintiff has subsequently amended its Complaint to include the additional claims above. In support of their motion, defendants[5] argue that (1) liability cannot be imposed on a municipality under § 1983 based on respondeat superior; (2) Davis is entitled to quasi-judicial absolute immunity; and (3) Davis is entitled to qualified immunity. This court will consider each argument in turn.

1. Municipal Liability Under 42 U.S.C. § 1983

First, defendants argue that a municipality cannot be liable under § 1983 based on respondeat superior. In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held "that a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. 658, 691 (1978) (emphasis in original). A plaintiff seeking to impose municipal liability under § 1983 must show a municipal policy or custom that caused plaintiff's injury. *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403-04. An act performed pursuant to "custom" may subject a municipality to liability if the custom is so widespread that it has the force of law. *Id.* at 404. Additionally, a municipality may be held liable under § 1983 based on a single decision "where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials

---

[5]For the purposes of Section II.A. of this Order, this court will refer to Davis and Franklin County, as "defendants."

responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Under *Pembaur*, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." 475 U.S. at 480. That policymaker does not have to be a legislative official either; in fact, "the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell's* language makes clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy.'" *Id.* at 480 (quoting *Monell*, 436 U.S. at 694). "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481. However, not every decision by a municipal officer with policymaking authority subjects the municipality to liability. *Id.* at 481-82. The official must be responsible for establishing "final" governmental policy in that area before liability attaches. *Id.* at 483. The Tenth Circuit has identified "three elements that help determine whether an individual is a 'final policymaker': (1) whether the official is meaningfully constrained 'by policies not of that official's own making'; (2) whether the official's decision are final-i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Whether an official has final policymaking authority is a question of state law. *Pembaur*, 475 U.S. at 483.

In *Praprotnik*, the Court summarized four key principles regarding municipal liability:

First . . . municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has

officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability. Third, whether a particular official has final policymaking authority is a question of *state law*. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

485 U.S. at 123 (internal citations omitted). "Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate." *Bd. of County Comm'rs of Bryan County*, 520 U.S. at 408.

Plaintiff concedes that defendants did not have an unconstitutional express policy or custom, but plaintiff argues Franklin County is liable based on the single act of executing the registered Ex Parte Temporary Injunction. Defendants argue that plaintiff's claim fails because (1) it did not identify a policy or custom in which either defendant had final policymaking authority and (2) Davis only enforced a facially valid court order which he had no authority to question or refuse to enforce.

It appears that the act or policy identified by plaintiff is Davis's enforcement of the Ex Parte Temporary Injunction. Sheriff Davis does have policymaking authority, which could justify municipal liability in certain circumstances. *See Smith v. Barber*, 195 F. Supp.2d 1264, 1271-72 (D. Kan. 2002) (holding that Chief of Police is a policymaking official, but plaintiff failed to allege specific wrongdoing by defendant in this case). The question is whether Davis had final policymaking authority regarding enforcement of the Ex Parte Temporary Injunction. To answer this question, it is necessary to look at state law and the Tenth Circuit's three elements for determining

whether an official has final policymaking authority. *See Pembaur*, 475 U.S. at 483; *Randle*, 69 F.3d at 448.

Defendants cite two Kansas statutory provisions for the assertion that a sheriff has no authority to establish policy when enforcing a court order. First, Kan. Stat. Ann. § 19-812 (2010) provides: "The sheriff, in person or by his undersheriff or deputy, shall serve and execute, according to law, all process, writs, precepts and orders issued or made by lawful authority and to him directed, and shall attend upon the several courts of record held in his county, and shall receive such fees for his services as are allowed by law." Second, Kan. Stat. Ann. § 60-2602 (2010) provides: "The sheriff shall endorse upon every summons, order of arrest, or for the delivery of property, or of attachment, injunction execution or order of sale, the day and hour it was received by him or her. The sheriff shall execute every summons, order or other process and return the same as required by law." Under both statutes, it is clear that a sheriff's duty to serve and execute orders of a court is not discretionary; rather the statutes provide that the sheriff "shall" execute court orders. *See* KAN. STAT. ANN. §§ 19-812; 60-2602. The Kansas Supreme Court has also held that a sheriff may not refuse to enforce a facially valid court order. *See Kasparek v. Throop*, 98 Kan. 551, 158 P. 1114 (1916) (holding that a sheriff executing a tax warrant was not subject to liability because the warrant was facially valid) (citing an older version of KAN. STAT. ANN. § 19-812). Both Kan Stat. Ann. §§ 19-812 and 60-2602, clearly indicate that a sheriff in Kansas does not have the authority to analyze independently a court order and refuse to enforce it. Stated simply, sheriffs must execute court orders and do not have authority to determine whether or not to execute a facially valid court order.

As a result, his acting to enforce the Franklin County District Court's order cannot subject the county to liability.[6]

Citing *Kirkpatrick v. Ault*, 174 Kan. 701, 258 P.2d 262 (1953), plaintiff argues that the language "as are allowed by law" and "as required by law" in Kan Stat. Ann. §§ 19-812 and 60-2602, requires the sheriff to conduct a review of a court order before executing it and to refuse to execute it if he finds it unlawful. However, the court in *Kirkpatrick* did not hold that a sheriff may determine the validity of a court order before enforcing it. Rather, the court held a sheriff does not have to execute a court order against land or property that does not belong to the judgment debtor—a holding inapplicable to this situation. *See id.* at 708-09, 258 P.2d at 268. Plaintiff also generally argues that Davis should have performed a review of this order before executing it. This argument fails because, as stated above, sheriffs have no authority to determine the validity of court orders. *See* KAN. STAT. ANN. §§ 19-812; 60-2602. Kansas vests in sheriffs the power only to enforce court orders. *See* KAN. STAT. ANN. §§ 19-812; 60-2602. It is purely the province of the judiciary to determine a court order's validity. *See* KAN. CONST. ART. III, § 1 ("The judicial power of this state shall be vested exclusively in one court of justice, which shall be divided into one supreme court, district courts, and such other courts as are provided by law."). Because Davis did not have authority to refuse to enforce the state court order, it is unnecessary to analyze whether his enforcement decision was final or whether it was in the realm of his grant of authority.

This result does not change notwithstanding the Kansas Supreme Court's later decision that the Ex Parte Temporary Injunction was not entitled to full faith and credit under the U. S. Constitution because the act of enforcing a facially valid injunction does not constitute an

---

[6]A sheriff does have discretion in the manner in which he executes court orders.

unconstitutional act or policy under *Monell*, which would justify municipal liability. *See Shelton v. Wallace*, 1996 WL 428363, *3 (6th Cir. 1996) (holding "[t]he municipal and county officers executed a facially valid TRO issued by a state court judge. The policy of enforcing state court orders, even if we assume that those orders may from time to time be erroneous, cannot be an unconstitutional policy."); *Green v. Metropolitan Government of Nashville & Davidson County*, No. 3:06-1216, 2008 WL 762198, at *6 (M.D. Tenn. Mar. 20, 2008) (holding that a sheriff's action of enforcing a facially-valid writ of execution issued by the clerk's office pursuant to a judge's final judgment cannot amount to an unconstitutional policy under § 1983).

Based on the above analysis, this court holds that Sheriff Davis did not have final policymaking authority regarding enforcement of the Ex Parte Temporary Injunction. As such, plaintiff has failed to allege a municipal policy, custom, or single act committed by Franklin County which caused plaintiff's injury. Therefore, plaintiff has failed to state a claim for which relief may be granted, and this court dismisses plaintiff's § 1983 claim against the Franklin County, Kansas Board of Commissioners.

2. Quasi-Judicial Absolute Immunity

Next, defendants argue that Sheriff Davis is entitled to quasi-judicial absolute immunity. The Tenth Circuit has held that "[j]ust as judges acting in their judicial capacity are absolutely immune from liability under section 1983, official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed

by that order."[7] *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (internal citations omitted). Absolute immunity for such officials is needed to ensure that they can perform their official duties without the need to secure permanent legal counsel. *Id.* This, however, does not mean that an official carrying out a judicial order is always protected by absolute immunity. *Id.* There are limits as to how unlawful an order can be and still shield the officer who executed it from liability. *Id.* An official is only entitled to quasi-judicial absolute immunity if "(1) the judge issuing the disputed order must be immune from liability in his or her own right, (2) the officials executing the order must act within the scope of their own jurisdiction, and (3) the officials must only act as prescribed by the order in question." *Id.* (alterations added). The court order must also be facially valid. *Id.* at 1164.

### a. Judge's Immunity

Under the first prong of quasi-judicial absolute immunity, "a state official is not absolutely immune from damages arising from the execution of an order issued by a judge acting 'in the clear absence of all jurisdiction.'" *Id.* (quoting *Stump v. Sparkman*, 435 U.S. 349, 357 (1978)). A judge does not act in the clear absence of all jurisdiction even if the action she took was erroneous, done maliciously, or outside of her authority. *Id.* "A judge is immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of 'grave procedural errors.'" *Id.* at 1163-64 (quoting *Stump*, 435 U.S. at 359). When immunity is at issue, the judge's jurisdiction must be construed broadly and "'the necessary inquiry in determining whether a defendant judge is

---

[7]"Absolute immunity," available to those executing court orders, is sometimes referred to as "quasi-judicial absolute immunity." *See Moss v. Kopp*, 559 F.3d 1155, 1163 n.9 (10th Cir. 2009). This court will use the terms interchangeably.

immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him.'" *Id.* at 1164 (quoting *Stump*, 435 U.S. at 356).

The Supreme Court's decision in *Stump v. Sparkman* is particularly instructive on this issue. In *Stump*, the Court held that an Indiana circuit court judge did not act in the clear absence of all jurisdiction when he approved a petition, which provided for the sterilization of a minor. 435 U.S. at 351-64. The Court came to this conclusion for two main reasons. First, the Indiana circuit court was a court of general jurisdiction. *Id.* at 357-58. Even though no statute authorized the judge to exercise jurisdiction over sterilization petitions, this potential error in exercising jurisdiction did not make the judge liable for damages. *Id.* at 357-59. Second, no specific appellate ruling in Indiana at the time the petition was approved held that a circuit court judge lacked jurisdiction to consider such a petition. *Id.* at 358. After the judge issued the order, but before the Supreme Court appeal, the Indiana Court of Appeals held that a parent does not have a right to have a minor child sterilized. *Id.* The Supreme Court held that this intervening holding did not mean the circuit judge had acted in clear absence of all jurisdiction because that case only held that a parent does not have the ability to force sterilization upon a child. The case did not hold that a circuit court lacked jurisdiction to consider the sterilization petition. *Id.* at 358-59 ("The opinion, however, speaks only of the rights of the parents to consent to the sterilization of their child and does not question the *jurisdiction* of a circuit judge who is presented with such a petition from a parent.") (emphasis in original).

The issue here is whether the circuit court judge in Florida had subject matter jurisdiction to issue the Ex Parte Temporary Injunction; thus, providing that judge with immunity. First, it must be noted that the Florida circuit court in this case is a court of general jurisdiction. *See* FLA. STAT.

§ 26.012 (2004);[8] *see also R.L. LaRoche, Inc. v. Barnett Bank of S. Florida, N.A.*, 661 So.2d 855, 859 (Fla. App. 4 Dist. 1995) (stating "[t]he circuit court in Florida is a court of general jurisdiction"). Additionally, the statute explicitly authorizes the circuit courts to issue injunctions. FLA. STAT. § 26.012(3). Plaintiff argues that because the order was temporary and ex parte, it divested the circuit court judge of jurisdiction. However, Florida law specifically authorizes the issuance of ex parte temporary injunctions. *See* FLA. R. CIV. P. 1.610. And the plaintiff does not argue that Padron did not follow this procedure. If the Florida judge's order was in error, even grave procedural error, there is no indication under Florida law that the judge lacked subject matter jurisdiction to enter the Ex Parte Temporary Injunction. Therefore, plaintiff has failed to show that the Florida circuit court judge acted in the clear absence of all jurisdiction.

Plaintiff also argues that to the extent the judgment was registered in Kansas, that act was done in the clear absence of all jurisdiction, as provided in *Padron v. Lopez*. Once ordered in Kansas, the Ex Parte Temporary Injunction was registered in the District Court of Franklin County, Kansas through the clerk's office. Davis then executed the order as provided by the Florida judge. Essentially, plaintiff argues that because the Kansas Supreme Court in *Padron* held that the Ex Parte

---

[8]Fla. Stat. § 26.012 provides in part that:
(2) They shall have exclusive original jurisdiction:
    (a) In all actions at law not cognizable by the county courts;
    (b) Of proceedings relating to the settlement of the estates of decedents and minors, the granting of letters testamentary, guardianship, involuntary hospitalization, the determination of incompetency, and other jurisdiction usually pertaining to courts of probate;
    (c) In all cases in equity including all cases relating to juveniles except traffic offenses as provided in chapters 316 and 985;
    (d) Of all felonies and of all misdemeanors arising out of the same circumstances as a felony which is also charged;
    (e) In all cases involving legality of any tax assessment or toll or denial of refund, except as provided in s. 72.011;
    (f) In actions of ejectment; and
    (g) In all actions involving the title and boundaries of real property.
(3) The circuit court may issue injunctions.

Temporary Injunction was not entitled to full faith and credit, the Franklin County District Court acted in the clear absence of all jurisdiction by registering it in Kansas.[9] The Kansas Supreme Court decided *Padron v. Lopez* a year and a half after Padron registered the Ex Parte Temporary Injunction in Kansas. At the time, no Kansas Supreme Court case or any other Kansas court had specifically held that temporary injunctions were not entitled to full faith and credit. *Padron*, 289 Kan. at 1101, 220 P.3d at 354 (stating that "there does not appear to be any controlling authority on point; the parties do not cite and we have not found a Kansas case determining whether a prejudgment order, such as a temporary restraining order or injunction, is entitled to full faith and credit"). Even though, the Kansas Supreme Court held that the district court lacked subject matter jurisdiction to enforce the order, this does not mean that the district judge acted in the clear absence of all jurisdiction at the time it registered the injunction. Prior to the Kansas Supreme Court's decision, it was unclear whether a district court had subject matter jurisdiction over a foreign non-final order. Given the lack of precedent on the issue, it cannot be said that the Franklin County District Court acted in the clear absence of all jurisdiction. This conclusion is strengthened by the court's statement in *Padron* that the district court could have enforced the Ex Parte Temporary Injunction on the basis of comity to the extent that it prohibited "selling, transferring, transporting, encumbering, auctioning, and operating" the King Air. *See* 289 Kan. at 1109, 220 P.3d at 359.

---

[9]Plaintiff also appears to argue that quasi-judicial absolute immunity does not apply to defendants because the Florida circuit judge did not have personal jurisdiction over plaintiff when he issued the Ex Parte Temporary Injunction. However, the Tenth Circuit has held that a lack of personal jurisdiction does not doom a claim of quasi-judicial absolute immunity. *Crabtree by and Through Crabtree v. Muchmore*, 904 F.2d 1475, 1477 (10th Cir. 1990) (stating that "[i]f we accepted [plaintiff's lack of personal jurisdiction] theory, no judge could claim judicial immunity for his actions if he incorrectly determined that his court had personal jurisdiction over parties to a suit, or over persons who held an interest in property in which the court was adjudicating ownership at the behest of another").

The Florida court had jurisdiction to grant the Ex Parte Temporary Injunction and neither the Florida court nor the Franklin County District Court acted in the clear absence of all jurisdiction. Therefore, defendants have satisfied this element of quasi-judicial absolute immunity.

### b. Within the Scope of the Official's Jurisdiction

The second element requires that the official who executed the order must act within the scope of jurisdiction. *Moss*, 559 F.3d at 1163. Essentially, this means that the official must have acted pursuant to state law when executing the order. *Id.* at 1167. As stated earlier, Kansas law specifically directs sheriffs, such as Davis, to execute judicial orders. *See* KAN. STAT. ANN. § 19-812 ("[t]he sheriff, in person or by his undersheriff or deputy, shall serve and execute, according to law, all process, writs, precepts and orders issued or made by lawful authority and to him directed, and shall attend upon the several courts of record held in his county, and shall receive such fees for his services as are allowed by law"); KAN. STAT. ANN. § 60-2602 ("[t]he sheriff shall endorse upon every summons, order of arrest, or for the delivery of property, or of attachment, injunction execution or order of sale, the day and hour it was received by him or her. The sheriff shall execute every summons, order or other process and return the same as required by law"). Further, Davis could have been fined if he had refused to execute the injunction. *See* KAN. STAT. ANN. § 19-820 (2010) ("Whenever any sheriff shall neglect to make due return of any writ or process delivered to him to be executed, or shall be guilty of any default or misconduct in relation thereto, he shall be liable to fine or attachment, or both, at the discretion of the court, subject to appeal; such fine, however, not to exceed two hundred dollars; and also an action for damages to the party aggrieved."); KAN. STAT. ANN. § 60-2604 ("If any . . . sheriff . . . fails without clearly excusing

cause, to discharge or perform a duty imposed upon such . . . sheriff . . . the court may on motion

of any injured party and with not less than 14 days' notice, cause such officer to be amerced for the

benefit of the injured party. . . .).

Plaintiff also argues that Davis acted outside his jurisdiction because he executed the order

the same day it was registered and, thus, deprived plaintiff of an opportunity to receive notice of the

registration and seek a stay of execution. Plaintiff is correct that Kansas law permits a party to stay

enforcement of a foreign judgment. *See* KAN. STAT. ANN. § 60-3004 (2010). But, that law does not

require a sheriff to wait a certain period before enforcing a court order. *See id.* In fact, Kan. Stat.

Ann. § 60-2602 specifically directs a sheriff to execute court orders the same day and hour it was

received. Davis obeyed the statutes and executed the order. Based on the facts presented, it cannot

be said that he acted outside the scope of his jurisdiction.

### c. Act in a Manner Prescribed by the Order

The third element requires the official to act only as prescribed by the order in question.

*Moss*, 559 F.3d at 1163. Quasi-judicial absolute immunity only protects defendants from damage

claims directed at the conduct prescribed by the order, it does not apply to the manner of the order's

execution. *Id.* at 1167. Here, the Ex Parte Temporary Injunction ordered, in part, the following:

> Defendants HERNAN LOPEZ, PTC AVIATION CORPORATION, DODSON
> INTERNATIONAL PARTS, INC., DODSON AVIATION, INC., DODSON
> INTERNATIONAL, 1st SOURCE BANK, and all others in possession of the
> Aircraft known as N750HL, bearing Serial Number BB-48 are hereby enjoined from
> selling, transferring, transporting, encumbering, auctioning, and operating the
> Aircraft without further Order of Court.

> Defendants HERNAN LOPEZ, PTC AVIATION CORPORATION, DODSON
> INTERNATIONAL PARTS, INC., DODSON AVIATION, INC., DODSON
> INTERNATIONAL, 1st SOURCE BANK, and all others in possession of the

> Aircraft known as N750HL, bearing Serial Number BB-48 are hereby Ordered to transfer possession of the Aircraft to Plaintiff PADRON and/or his authorized agent upon presentation of a copy of this Order, to be relocated to the facility of PADRON's choice in Miami Dade County, Florida.

(Dkt. No. 18, Ex. 1, para. 2-3). Plaintiff argues that Davis exceeded the scope of the order because Davis (1) threatened arrest, and (2) denied plaintiff's request for a review of the lawfulness of the order.

The Ex Parte Temporary Injunction did not specifically authorize Davis to threaten arrest if plaintiff refused to relinquish the King Air. But, threatening arrest is substantially different from conduct which the Tenth Circuit has held exceeds the scope of a judicial order for purposes of quasi-judicial absolute immunity. *Compare Moss*, 559 F.3d at 1167 (stating that defendant's threat to "kick in" the plaintiffs' door did not exceed the judge's order, even though not specifically provided for in the order), *with Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990) (holding that defendants exceeded scope of judge's order when they placed plaintiff in a maximum security ward even though the order directed defendants to place plaintiff in a hospital). While Davis did threaten arrest, he did not arrest anyone, and he simply carried out the directives in the order. Plaintiff's main complaint is that the King Air was removed from its facility. However, because the Ex Parte Temporary Injunction explicitly ordered removal of the King Air, plaintiff cannot claim that Davis exceeded the scope of the order. Threatening arrest, although technically outside the directive of the order, was not so egregious that it exceeded the scope of the order for purposes of this element of quasi-judicial absolute immunity. Thus, defendants have satisfied this prong of the test.

### d. Facial Validity

The last element necessary for finding quasi-judicial absolute immunity is that the order must be facially valid. *Moss*, 559 F.3d at 1163. The Tenth Circuit has stated that "even assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid." *Id.* at 1165. "State officials 'must not be required to act as pseudo-appellate courts scrutinizing the orders of judges,' but subjecting them to liability for executing an order because the order did not measure up to statutory standards would have just that effect." *Id.* (quoting *Valdez v. City & County of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989)). A broad conception of facially validity is necessary because the unhesitating execution of court orders is essential to the judicial systems' authority and function, and state officers subject to liability would be more likely to refuse to enforce court orders. *Id.*

The Ex Parte Temporary Injunction entered in Florida and registered in Kansas did not lack facial validity for several reasons. First, as previously stated, Kansas law requires a sheriff to execute and obey a court's order. *See* KAN. STAT. ANN. §§ 19-812; 60-2602. Further, Davis risked fines if he did not follow the court order. *See* KAN. STAT. ANN. §§ 19-820; 60-2604. The Tenth Circuit has held that an order may be unlawful or erroneous and yet still facially valid and that oftentimes a contrary finding would not be consistent with the goals of quasi-judicial absolute immunity. *See Moss*, 559 F.3d at 1165. This case presents precisely this scenario. At the time Davis executed the Ex Parte Temporary Injunction, no Kansas case held that a temporary injunction was not entitled to full faith and credit, or that a district judge does not have subject matter jurisdiction to consider such an order. The mere fact that the Kansas Supreme Court subsequently held this particular Ex Parte Temporary Injunction was not entitled to full faith and credit does not transform that erroneous order into a facially invalid one. *See Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005)

(holding that a state district court judge was entitled to absolute immunity when he initially refused to grant a dismissal and the Oklahoma Supreme Court subsequently ordered him to grant the dismissal); *see also Moss*, 559 F.3d at 1166 (stating that even if the court orders were unlawful, that mere fact does not make them facially invalid); *Turney*, 898 F.2d at 1473 (stating that "[t]o allow plaintiffs to bring suit any time a state agent executes a judicial order which does not fulfill every legal requirement would make the agent a lightning rod for harassing litigation aimed at judicial orders") (internal quotations omitted).

Further, Davis, a sheriff without any formal legal training, is authorized under Kansas law to enforce foreign judgments. *Padron*, 289 Kan. at 1099, 220 P.3d at 353 (stating that "foreign judgments and journal entry recitals are presumed valid and may not be impeached by collateral attack except for lack of jurisdiction or fraud in the procurement"). "[O]nce a copy of an authenticated judgment from another state is filed with a clerk of the district court, the foreign judgment is then treated as a judgment of [Kansas] and can be executed upon the same." *Id.* at 1096, 220 P.3d at 352; *see also* KAN. STAT. ANN. § 60-3002 (2010) ("A copy of any foreign judgment authenticated in accordance with the act of congress, the statutes of this state or certified in accordance with the statutes of the state in which the judgment was rendered, may be filed in the office of the clerk of any district court of this state. . . . The clerk of the district court shall treat the foreign judgment in the same manner as a judgment of the district court of this state. A judgment filed as provided by this section has the same effect and is subject to the same procedures, defenses and proceedings as a judgment of a district court of this state and may be enforced or satisfied in like manner."). Prior to the Kansas Supreme Court's holding in *Padron*, Davis had no reason to doubt the validity of the Ex Parte Temporary Injunction. Other foreign judgments are frequently given

effect and enforced in Kansas. The mere fact that this was a temporary injunction, the enforcement of which was later held to be unlawful, does not effect the facially validity of the order as presented to Davis in March 2008. Therefore, this court finds that the Ex Parte Temporary Injunction was facially valid and this element is met.

In finding that Davis has satisfied all the necessary elements of quasi-judicial absolute immunity, this court holds that he is entitled to absolute immunity and plaintiff's 42 U.S.C. § 1983 claim against him is dismissed. Furthermore, even if Davis was not entitled to quasi-judicial absolute immunity, he is entitled to qualified immunity.

3. Qualified Immunity

Last, defendants argue that Davis is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When determining whether an individual is entitled to qualified immunity, the court must determine (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Id.* at 815-16. However, the Supreme Court has held that the district courts have discretion to consider the two elements of qualified immunity in any order deemed appropriate. *Id.* at 818-23. After a defendant asserts a claim of qualified immunity, the plaintiff has the burden of proving that the defendant is not entitled to qualified immunity. *PJ ex rel. Jensen v. Wagner*, 603

F.3d 1182, 1196 (10th Cir. 2010). However, this court will review the evidence in the light most favorable to the plaintiff. *See Fletcher v. Burkhalter*, 605 F.3d 1091, 1096 (10th Cir. 2010).

First, this court will consider whether defendants actions violated clearly established statutory or constitutional rights. In analyzing this element, it is important to note that the "clearly established right" standard is an objective one that is only met if the defendant should have known he violated plaintiff's rights. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Harlow*, 457 U.S. at 818). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citations and quotations omitted). The facts of the present situation do not have to be materially similar to a previous case in order for the right to be clearly established. *See id.* It is possible that certain conduct violates clearly established law even in novel factual circumstances. *Id.* at 741. Our task in this case is to determine whether Davis's action of enforcing the Ex Parte Temporary Injunction violated a clearly established right.

Plaintiff argues that its rights were violated under the Full Faith and Credit Clause and the Due Process Clause of the Fourteenth Amendment. This court must analyze the state of the law in March 2008—the time Davis enforced the Ex Parte Temporary Injunction. At that time, no Supreme Court or Tenth Circuit case had addressed whether a temporary injunction executed in one state was entitled to full faith and credit in another. Additionally, the Kansas Supreme Court first addressed the issue in *Padron v. Lopez*, over a year and a half after the conduct in question. 289 Kan. at 1101, 220 P.3d at 354. While some state courts have held that such orders are not entitled to full faith and

credit, it is clear that the right was not clearly established. *See Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1187 (10th Cir. 2001) (stating "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains") (internal quotations omitted).

The alleged due process violation produces a similar dearth of cases establishing a violation in this situation. Plaintiff points to no authority establishing a due process violation based on the enforcement of a foreign temporary injunction. Plaintiff argues the right was clearly established because the Due Process Clause requires at a minimum that notice and an opportunity be afforded before the deprivation of a property right. While this proposition is true, it does not directly support plaintiff's argument that its due process rights were violated in this situation. In *Anderson v. Creighton*, the Supreme Court stated the following:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."

483 U.S. 635, 639 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)); *see also McBride v. Taylor*, 924 F.2d 386, 390 (1st Cir. 1991) (holding that a temporary injunction order did not

violate plaintiff's due process rights because at the time of its enforcement the right was not clearly established). The Fourth Circuit has also held that "[e]ven assuming the order is invalid . . . We have held that due process is not violated by police officers who rely upon an order in good faith which is subsequently determined to be invalid." *Brewster v. John Doe*, 1987 WL 35039, at *1 (4th Cir. 1987).

Plaintiff has the affirmative duty to prove Davis is not entitled to qualified immunity; however, plaintiff presented no evidence and this court finds no authority which clearly establishes plaintiff's alleged Full Faith and Credit or Due Process Clause rights. As such, Davis is entitled to qualified immunity on plaintiff's 42 U.S.C. § 1983 claims.[10]

In summary, this court finds that the Franklin County, Kansas Board of Commissioners is not subject to municipal liability based on respondeat superior under *Monell*. This court also finds that defendant Davis is entitled to quasi-judicial absolute immunity and qualified immunity for his conduct in enforcing the Ex Parte Temporary Injunction. Therefore, plaintiff's 42 U.S.C. § 1983 claim contained in Count III of the Amended Complaint (Dkt. No. 52) is dismissed. The other two counts against defendants contained in Count I and Count IV, are not properly before the court at this time and will not be dismissed.[11]

---

[10]Plaintiff takes great pains to bring to the court's attention the alleged grave injustice he has endured because of defendant's enforcement of the Ex Parte Temporary Injunction. However, the Tenth Circuit has stated that "'[t]he proper procedure for a party who wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the underlying judgment, not to sue the official responsible for its execution.'" *Valdez v. City & County of Denver*, 878 F.2d 1285, 1289-90 (10th Cir. 1989) (quoting *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1239 (7th Cir. 1986)). Plaintiff argues that it did appeal to the Kansas Supreme Court, but that the court refused to exercise jurisdiction over plaintiff's counterclaims; thus, depriving it of a remedy. However, plaintiff currently has a pending action against Padron and Jorda in this court. And, plaintiff could have taken steps to modify or quash the Ex Parte Temporary Injunction in Florida.

[11]Defendants filed their Motion for Judgment on the Pleadings on May 14, 2010. Subsequently, plaintiff amended its Complaint to add two new claims against defendants: abuse of process (against both), and negligence (against Davis only). Because these additional claims are not before this court in defendants' motion, the court will not dismiss these claims. Nevertheless, the court notes that if the claims were properly before the court, it is likely

*B. Defendants HLMP Aviation Corporation, Javier Jorda, and Orlando Padron's Motion for Summary Judgment (Dkt. No. 33).*

Plaintiff asserts two state law claims against HLMP, Jorda, and Padron:[12] abuse of process and conversion. In their Motion for Summary Judgment, defendants argue that the abuse of process claim should be dismissed because plaintiff cannot show defendants made a knowingly illegal use of process or that process was issued with an improper motive. With regard to the conversion claim, defendants argue that the Ex Parte Temporary Injunction authorized them to take possession of the King Air and plaintiff has therefore failed to establish its claim. Finally, defendants argue that both claims fail because plaintiff failed to plead any compensable damages.

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

they would be dismissed for similar reasons set out in this Order.

[12]In this section, the word "defendants" will refer to HLMP, Jorda, and Padron.

242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

1. Abuse of Process

Plaintiff's first claim against these defendants is abuse of process. Plaintiff bases this claim on defendants' acts of registering the Ex Parte Temporary Injunction and removing the King Air from Dodson's facilities. Defendants argue plaintiff cannot establish the elements of an abuse of process claim.[13]

Under Kansas law, "[t]he essential elements of [an abuse of process claim] are a knowingly illegal or improper use of the process done for the purpose of harassing or causing hardship, which resulted in damage to the state court plaintiff." *McShares, Inc. v. Barry*, 266 Kan. 479, 494, 970 P.2d 1005, 1015 (1998) (citing *Porter v. Stormont-Vail Hosp.*, 228 Kan. 641, 653-54, 621 P.2d 411, 415

---

[13]Defendants also argue that because the injunction was wrongly issued and enforced, the injunction bond is the sole source of recovery of any damages resulting from the wrongful issuance of the injunction. It is unnecessary to address this issue because, as described below, plaintiff's abuse of process claim fails.

(1980)). "In abuse of process it is said the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself, for an end other than that which it was designed to accomplish." *Vanover v. Cook*, 260 F.3d 1182, 1191 (10th Cir. 2001). The purpose for which the process is used, after it is issued, is the only thing of importance. *Thomas v. City of Baxter Springs, Kan.*, 369 F. Supp.2d 1291, 1299 (D. Kan. 2005). The Kansas Court of Appeals recently described abuse of process in this manner:

> "Abuse of process contemplates some overt act done in addition to the initiating of the suit; thus, the mere filing or maintenance of a lawsuit, even for an improper purpose, is not a proper basis for an abuse of process action. Generally, therefore, no right of action exists for damages resulting from the institution and prosecution of a civil action if the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint, even if the plaintiff had an ulterior motive in bringing the action, or if the plaintiff knowingly brought suit upon an unfounded claim. However, if the suit is brought not to recover on the cause of action stated in the complaint but to accomplish a purpose for which the process was not designed, there is an abuse of process. For example, a person who resorts to legal process to have another declared incompetent or committed to a state mental hospital does not commit an abuse of process, no matter what the person's motives, if he or she uses the commitment proceedings in order to provide treatment to a mentally disabled individual; however, an action may be maintained where the defendant perverts the process in order to commit a person that he or she knows is not in need of treatment."

*Caldwell-Baker Co. v. Tideman*, Nos. 95,600, 95,618, 2007 WL 136029, at *7 (Kan. Ct. App. Jan. 19, 2007) (citing 1 AM. JUR.2D. ABUSE OF PROCESS § 11 (2007)). There are few Kansas cases that thoroughly discuss and analyze an abuse of process claim. Nevertheless, "[i]n the absence of definitive direction from the highest court of the state of Kansas, we must 'predict the course that body would take if confronted with the issue.'" *Vanover*, 260 F.3d at 1186 (quoting *Strauth v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 236 F.3d 1260, 1267 (10th Cir 2001)).

This court must decide whether the defendants caused the issuance of the Ex Parte Temporary Injunction for a purpose other than preventing the plaintiff from selling or transferring

the King Air, and that the plaintiff suffered damages. Defendants have produced evidence showing they sought and registered the Ex Parte Temporary Injunction to prevent plaintiff from selling the King Air to someone else. Defendants also point to Dodson's March 14, email, which stated, "[t]his is to advise you that unless we have a resolution in sight by close of business on March, 19th, 2008, I will be exercising all available remedies including but not limited to a NON-Judicial sale of the aforementioned aircraft." (March 14, 2008 email from Dodson Jr. to Manuel Mesa, Dkt. No. 34, Ex. 19). Plaintiff fails to produce any evidence that creates a material issue of fact on this point. Plaintiff does argue that defendants made an illegal, improper, and perverted use of process by registering the Ex Parte Temporary Injunction and removing it from plaintiff's facility. Plaintiff claims that defendants did so with the ulterior motive or purpose of permitting Padron an advantage in an unrelated dispute with Lopez or to allow defendants to gain an advantage in a dispute over payment of the repair bill. However, when resisting a summary judgment motion a party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson*, 477 U.S. at 256. Plaintiff's bare allegations of an ulterior motive simply are not enough to create a genuine issue of material fact. Without the existence of an ulterior motive, plaintiff's abuse of process claim must fail.

Plaintiff also argues that summary judgement is inappropriate because defendants made a knowingly illegal use of process by registering the Ex Parte Temporary Injunction in Kansas, which the Kansas Supreme Court in *Padron* held was not entitled to full faith and credit. However, as discussed previously in this Order, the Kansas Supreme Court ruled as a matter of first impression that the Ex Parte Temporary Injunction was not entitled to full faith and credit. *Padron*, 289 Kan. at 1102-03, 220 P.3d at 355. Defendants registered the injunction a year and a half before the court's holding in *Padron*. At that time, they had no reason to believe that the injunction was not entitled

to full faith and credit in Kansas, and they certainly could not have sought it knowing it was illegal.[14] The lack of precedent on the issue forecloses plaintiff's argument that defendants made a knowingly illegal use of process.

Plaintiff cannot show a genuine issue of material fact on whether defendants knew the Ex Parte Temporary Injunction was illegal or that defendants had an improper motive in obtaining it. As such, it is unnecessary to determine whether plaintiff could prove any compensable damages to support the abuse of process claim. Therefore, defendants, HLMP Aviation Corporation, Javier Jorda, and Orlando Padron's Motion for Summary Judgment (Dkt. No. 33) is granted on plaintiff's abuse of process claim.

2. Conversion

Plaintiff's second claim against these defendants is for conversion. Plaintiff argues defendants wrongfully acquired possession of the King Air by registering and executing the Ex Parte Temporary Injunction, constituting a conversion. Defendants argue that plaintiff cannot establish that the exercise of ownership rights was unauthorized because the Ex Parte Temporary Injunction authorized removal of the King Air.

Under Kansas law, "[a] conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another." *Schofield Bros., Inc. v. State Farm Mut. Auto. Ins. Co.*, 242 Kan. 848, 850, 752 P.2d 661, 662 (1988) (citing *Nelson v. Hy-Grade Constr. & Materials, Inc.*, 215 Kan. 631, 634, 527 P.2d 1059, 1061 (1974)). However, court orders

_____

[14]It is important to note that the Kansas Supreme Court did find that the Ex Parte Temporary Injunction could have been enforced as a matter of comity to the extent that it prevented plaintiff from selling the King Air. *Padron*, 289 Kan. at 1109, 220 P.3d at 359.

that authorize the taking of personal property cannot form the basis for a conversion claim if the court order is valid or fair on its face. *Herndon v. The City of Park City, Kan.*, No. 07-1065, 2007 WL 2746795, at *4 (D. Kan. Sept. 20, 2007) (citing THE RESTATEMENT (SECOND) OF TORTS § 266 (1965)).

Once again, plaintiff relies on the Kansas Supreme Court's holding in *Padron* to argue that defendants' use of the Ex Parte Temporary Injunction was an unauthorized assumption and exercise of the right of ownership over the King Air. Plaintiff contends that because *Padron* held the Ex Parte Temporary Injunction was not entitled to full faith and credit, defendants cannot argue that the alleged conversion was authorized by a court order. This argument fails to acknowledge that the court order need not ultimately be held valid, it only need be valid when issued or fair on its face. *See Herndon*, 2007 WL 2746795, at *4. The Tenth Circuit's opinion in *Whitehead v. Allied Signal, Inc.*, is instructive on this point. 1998 WL 874868 (10th Cir. 1998). In *Whitehead*, defendants acquired 40 acres of the plaintiff's land pursuant to a prior district court order. *Id.* at *1. The Tenth Circuit later vacated that order. *Id.* Plaintiff then brought suit claiming forcible ejectment and abuse of process. *Id.* In ruling for the defendant, the court stated, "[w]e will not, however, look beyond the fact that the district court's order was facially valid and made within its jurisdiction, until such time as it was vacated by this court." *Id.* at *3.

The Florida circuit court had authority and jurisdiction to issue the Ex Parte Temporary Injunction. It was also facially valid. The fact that the Kansas Supreme Court later held that it was not entitled to full faith and credit does not change the result. Defendants were authorized by the Florida court order to seize the King Air and remove it to Florida. *See Whitehead*, 1998 WL 874868, at *3 (stating "[p]arties should not be forced to second-guess compliance with such orders because

of the threat of trespass or other tort liability should such orders later be vacated or otherwise withdrawn"). The court's holding in *Padron* does not mean that the removal of the King Air was unauthorized. Therefore, plaintiff's conversion claim from the time defendants removed the King Air until the Kansas Supreme Court's holding in *Padron* must fail.

Plaintiff also argues that even if the seizure of the King Air was initially valid, it became invalid once the Kansas Supreme Court issued its opinion in *Padron* and defendants' failure to return the King Air from that time constitutes a conversion. Kansas law appears to support such an argument to the extent the failure to return the property is unauthorized. *See Queen v. Lynch Jewelers, L.L.C.*, 30 Kan. App.2d 1026, 1037, 55 P.3d 914, 921 (2002); *see also Herndon*, 2007 WL 2746795, at *4. It is true that *Padron* explicitly held that once the Franklin County district court refused to grant the Ex Parte Temporary Injunction full faith and credit, it was without subject matter jurisdiction to issue any other orders, including an order requiring defendants to return the King Air to Dodson. But, that holding does not necessarily end the inquiry. At this stage in the litigation, it is unclear whether defendants' retention of the King Air after the holding in *Padron* was authorized. As a result, the court cannot grant summary judgment to defendants on plaintiff's conversion claim. *See Herndon*, 2007 WL 2746795, at *4 (quoting FED. R. CIV. P. 56(c)).

This court finds that because defendants were authorized to remove the King Air under the Ex Parte Temporary Injunction until the holding in *Padron*, a conversion claim during that time period must fail. But, after the holding in *Padron* there is a genuine material issue of fact about whether defendants were authorized to retain possession of the King Air. The court denies defendants' motion on plaintiff's conversion claim.

*C. Defendants Blaine Finch, and Green, Finch, and Covington, Chartered's Motion for Summary Judgment (Dkt. No. 40).*

Plaintiff asserts an abuse of process claim against Blaine Finch and Green, Finch, and Covington, Chartered.[15] Defendants argue that this claim must be dismissed because they did not register the Ex Parte Temporary Injunction knowing it was illegal and did not have an improper motive for registering it.

Defendants have produced evidence showing that Padron retained them to register the Ex Parte Temporary Injunction with the Franklin County District Court and that defendants did register the injunction. Plaintiff fails to create a genuine issue of material fact regarding defendants' motive in registering the order. *See Anderson*, 477 U.S. at 256 (stating in resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs). Plaintiff offers no facts suggesting defendants registered the Ex Parte Temporary Injunction for any purpose other than to allow Padron to remove the King Air. Without an improper motive after process was issued, plaintiff's claim fails.

Plaintiff again unconvincingly argues that the holding in *Padron* precluded summary judgment on this issue because defendants had knowledge of the illegality of the order; however, as described above, because *Padron* addressed a matter of first impression, defendants did not register the injunction knowing it was invalid. Without knowledge, plaintiff's abuse of process claim must also fail. Therefore, because plaintiff provides no evidence that defendants registered the Ex Parte Temporary Injunction other than for its intended purpose, or that defendants had knowledge

---

[15]For purposes of Section C, the court will use the word "defendants" to include Blain Finch and Green, Finch, and Covington, Chartered.

the injunction was invalid, this claim fails. Defendants, Blaine Finch, and Green, Finch, & Covington, Chartered's Motion for Summary Judgment (Dkt. No. 40) is granted.

## III. Conclusion

The court grants in part and denies in part defendants' motions for the reasons stated above. This court notes that because it has dismissed plaintiff's 42 U.S.C. § 1983 claim, the court's basis for subject matter jurisdiction no longer exists. However, under 28 U.S.C. § 1367(c), the court has discretion to exercise supplemental jurisdiction over pendant state law claims. Because of the court's familiarity with this case and its legal issues, the court finds that dismissing the remaining claims would result in further shuttling of this dispute from federal to state court. The court therefore exercises supplemental jurisdiction over plaintiff's remaining claims.

IT IS ACCORDINGLY ORDERED this day 21st day of March, 2011, that the following motions are granted: (1) defendants Craig A. Davis and the Franklin County Board of Commissioner's Motion for Judgment on the Pleadings (Dkt. No. 17); and (2) defendants Blaine Finch, and Green, Finch, & Covington, Chartered's Motion for Summary Judgment (Dkt. No. 40). As explained above, the abuse of process claim and negligence claim against Davis and the abuse of process claim against Franklin County are not dismissed.

IT IS FURTHER ORDERED that defendants, HLMP Aviation Corporation, Javier Jorda, and Orlando Padron's Motion for Summary Judgment (Dkt. No. 33) is granted in part and denied in part. The court grants summary judgment on plaintiff's abuse of process claim but denies defendants' motion on the conversion claim.

_s/ J. Thomas Marten_
J. THOMAS MARTEN, JUDGE